**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| DANIEL J. HOLLORAN,<br><br>       Plaintiff,<br><br>v.<br><br>JOSEPH G. LUKOWSKI, OWNER,<br>PRESIDENT, CEO, LAREDO<br>TECHNICAL SERVICES, INC.<br><br>       Defendants. | Case No. _____ |

**DEFENDANTS' NOTICE OF AND PETITION FOR REMOVAL**

Joseph G. Lukowski ("Lukowski") and Laredo Technical Services, Inc. ("Laredo") (collectively "Defendants"), by and through undersigned counsel, hereby file this Notice of and Petition for Removal ("Petition"), to remove this action from the Nebraska District Court for Sarpy County, to this Court on the basis of diversity of citizenship and in accordance with 28 U.S.C. §§ 1332, 1441, and 1446.  As grounds for this removal, Defendants state as follows:

**BACKGROUND**

1.      On July 9, 2021, Daniel J. Holloran ("Plaintiff") commenced a civil action in the Nebraska District Court for Sarpy County ("State Court Action") against Defendants by filing a Complaint bearing Case No. CI 21-1666 ("Complaint"). A copy of all pleadings on file in the State Court Action, including the Complaint, are attached as Exhibit A.

2.      The Complaint was served on Defendants on August 6, 2021. A copy of the Return of Service is also included as part of Exhibit A.

**TIMELY REMOVAL**

3.      This Petition is filed within thirty (30) days of Plaintiff's service of the Complaint upon Defendants.  Therefore, this Petition is timely filed pursuant to 28 U.S.C. § 1446(b).

## VENUE

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b).  The United States District Court for the District of Nebraska is the district in which the State Court Action was filed.

## SUBJECT MATTER JURISDICTION

5.      Pursuant to 28 U.S.C. §§ 1332(a), this Court has original jurisdiction over this matter.  This case may be removed pursuant to 28 U.S.C. §§ 1332(a) and 1441(b) because it is a civil action between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      If an action initially filed in state court is subsequently removed to federal court, whether the requirements of diversity jurisdiction under 28 U.S.C. § 1332(a) are satisfied is properly determined at the time of removal of the matter.  *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011).

## STATEMENT OF FACTS DEMONSTRATING COMPLETE DIVERSITY OF PARTIES

7.      Plaintiff is a resident of the state of Nebraska. (See Complaint ¶ 1). For diversity purposes, a person is a "citizen" of the state in which he or she is domiciled. *See Kantor v. Wellesley Galleries, Ltd*., 704 F.2d 1088, 1090 (9th Cir. 1983). Residence is *prima facie* evidence of domicile. *See State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994). Defendants therefore are informed and believe that Plaintiff is, and at all times relevant to this action was, a citizen of the State of Nebraska within the meaning of 28 U.S.C. § 1332 (a).

8.      Lukowski is a resident of the state of Texas. (See Complaint ¶ 2).

9.      Laredo is incorporated in the state of Texas with its principal Place of business in San Antonio, Texas.  (See Complaint ¶ 2). Pursuant to 28 U.S.C. § 1332 (c)(1), a corporation is a citizen of any state in which it is incorporated in addition to the state or foreign state in which it

2

maintains its principal place of business. *See Hertz Corp. v. Friend*, 559 U.S. 77, 80-81 (2010) (holding a corporation is a citizen "of any State by which it has been incorporated" and the corporation's "nerve center," which "will typically be found at a corporation's headquarters").

### AMOUNT IN CONTROVERSY EXCEEDS $75,000.00

10.     The jurisdictional requirement of 28 U.S.C. § 1332(a), that the amount in controversy exceed $75,000, exclusive of interests and costs, is met when the "fact-finder could legally conclude, from the pleadings and proof adduced to the Court before trial, that the damages that the Plaintiff suffered are greater than $75,000." *Kopp v. Kopp*, 280 F.3d 883, 884-85 (8th Cir. 2002).  In other words, as long as the fact-finder *might* conclude damages are above the requisite amount, the jurisdictional requirement is met.  *See Bell v. Hershey Co.*, 557 F.3d 953, 958 (8th Cir. 2009).

11.     While Defendants vehemently contest Plaintiff is entitled to any damages, Plaintiff is requesting damages in an amount that exceeds $75,000.  In his Complaint, Plaintiff demands $75,000 plus an additional 30% in damages. (See Complaint, p. 14).

### REMOVAL JURISDICTION BASED ON DIVERSITY OF CITIZENSHIP

12.     Because this Court has original subject matter jurisdiction over this matter based on diversity of citizenship under 28 U.S.C. § 1332, Defendants may remove this matter pursuant to 28 U.S.C. § 1441, which provides for removal by Defendants based on diversity jurisdiction.

13.     This action is not a non-removable action as described in 28 U.S.C. § 1445.

### NOTICE OF COMPLIANCE WITH PROCEDURAL REQUIREMENTS

14.     An accurate copy of all process, pleadings and orders filed in connection with the State Court Action is attached as Exhibit A, as required by 28 U.S.C. § 1446 (a).  There are no matters currently pending in the State Court Action which require resolution by this Court.

15.     In compliance with 28 U.S.C. § 1446(d), Defendants will promptly provide written notice of this Petition to Plaintiff, and file a copy of the Petition with the Nebraska District Court for Sarpy County.

WHEREFORE, Defendants respectfully request that this case be removed to this Court and the Court assume jurisdiction over this matter for all further proceedings.

Dated:  September 7, 2021.

Respectfully submitted,

*/s/Brock J. Pohlmeier*
Chad P. Richter, #22001
Brock J. Pohlmeier, #25817
JACKSON LEWIS P.C.
10050 Regency Circle, Suite 400
Omaha, Nebraska   68114
(402) 391-1991
(402) 391-7363 FAX
chad.richter@jacksonlewis.com
brock.pohlmeier@jacksonlewis.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2021, I served a true and accurate copy of the foregoing, via USPS First Class Mail, postage prepaid, upon the following:

Daniel Holloran
12730 S. 28th Ct.,
Bellevue, NE 68123

*/s/ Brock J. Pohlmeier*

4821-8695-1926, v. 1

4

## IN THE DISTRICT COURT OF SARPY COUNTY, NEBRASKA

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td><u>DANIEL J. HOLLORAN,</u></td><td>)</td><td>COMPLAINT OF WHISTLEBLOWER RETALIATION</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td>CASE NO. <u>C121-1666</u></td></tr>
<tr><td>vs.</td><td>)</td><td></td></tr>
<tr><td><u>JOSEPH G. LUKOWSKI,</u></td><td>)</td><td></td></tr>
<tr><td><u>OWNER, PRESIDENT, CEO,</u></td><td>)</td><td></td></tr>
<tr><td><u>LAREDO TECHNICAL SERVICES INC.</u></td><td>)</td><td></td></tr>
<tr><td>Defendant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

2021 JUL -9 PM 4: 24
CLERK DISTRICT COURT
FILED SARPY COUNTY DISTRICT COURT

1. *Plaintiff is a resident at 12730 S. 28th Ct., Bellevue, Nebraska 68123.

2. *Defendant has a mutual corporate and residential address of 22011 Roan Bluff, San Antonio, Texas 78259.

3. *On August 13th, 2020, I was summarily discharged per Laredo Technical Services and escorted off the premises by a USAF Contracting Officer. I was given notice of the firing by the General Practice Manager, Ms. Dana Conaway, a U.S. Civil Service employee at the 55th, Medical Group, 2501 Capehart Rd., Bellevue, Nebraska 68123. I worked for the Federal Contractor, Laredo Technical Services based in San Antonio, Texas. Laredo chose not to place an on-site supervisor to manage the operation. I worked as a Medical Appointment Clerk in the medical facility.

4. *Broke HIPAA Chain of Command? *Just days after being discharged I called Laredo and Ms. Tracey Heim without intro abruptly and angrily answered the phone by stating the reason I was fired was due to transgressing phone protocol and "Violating the HIPAA Chain of Command!" (I never asked why I was discharged). I have a clinical healthcare background (over 20 years), and a B.S. in Healthcare Management and know of no such chain of command in existence. Ms. Conaway used a phone call I had had just days before to retribute me for my disclosing her negligence in not addressing HIPAA violations being done by another Laredo employee. Though she was not our employer, I had brought this up as public policy, patient privacy and safety were being compromised. So, in my bringing it up to Ms. Conaway, the GPM, attests that I did not break an imaginary HIPAA Chain of Command. In fact, I began creating the links. As of today, over 27,000 patients still do not know that their HIPAA privacy protections have been possibly divulged. My own identity was once stolen via the military healthcare system (this was a national story). This lawsuit is not against the Air Force for insisting upon my discharge to Laredo (though it was unfounded and unjust). It is for Laredo adamantly proclaiming that I had not followed *their* "HIPAA Chain of Command". I have two recorded phone calls between Mr. Leonard Taylor and myself along with the written transcripts (Nebraska is a one-party consent State concerning taped conversations). Mr. Taylor can also be subpoenaed to testify that he did use the term of my "violating the HIPAA Chain of Command". Ms. Heim was not recorded but she can be



EXHIBIT

A

000729350D59

deposed also in person or via statement to attest she too claimed the phrasing. I had had another unrecorded conversation with Mr. Taylor trying to reason with him about this invented chain of command but to no avail. He did not however deny that I had violated "his" HIPAA Chain of Command on recordings.

5. *The reason for this lawsuit is that it has irreparably harmed me. I have education and experience in healthcare and to be discharged along with the term "HIPAA" has not bode well for me. Keep in mind, *All* corporations, not just those engaged in healthcare are cognizant and compliant with HIPAA. Laredo, in the person of Mr. Taylor (an employee of Mr. Lukowski) deliberately *did not* list the HIPAA offense as the reason they had fired me. So, this shows deliberate deception and absence of integrity; Laredo is not to be trusted. Prospective employers perhaps have been told that "I" had breached their homespun HIPAA protocol. After all, Ms. Heim boldly and freely volunteered this without my asking, why not to others? So, they would wrongly assume that I had been the one who had actually violated HIPAA and not the one who had indeed reported it. And, at the mere mention of HIPAA connected with myself no organization would want to hire a whistleblower, or, in an interview would believe that an employer would unlawfully discharge me for my following Federal law. After all, how could a Federal Contractor not comprehend obeying Federal statute, especially with Mr. Taylor being a former USAF Medical Service Corps Administrator? Incredulous but true.

6. *A Laredo employee mentioned to me that another Laredo employee would stay on the Facetime app while on calls with patients. She would pause the conversation, let them know a call was coming in and resume the private conversation after the incoming call was terminated. I had witnessed this on occasion, but it did not make sense to me at the first as I do not use apps. I also assumed she would disconnect her private call when a public one came in. So, names, medical conditions, and vital demographics such as social security numbers were overheard by an eavesdropping public. *This was a prima facie, patent violation of HIPAA, "Reasonable Standards", 45 C.F.R. §164.530.* In the cyberelectronic eavesdropping age what more was needed? The Air Force, in concert with the government contractor, Laredo, did all they could do to protect this employee *and* their reputations, regardless of HIPAA concerns. Corroborating statements in emails by other Laredo employees along with mine were submitted to support my inhouse HIPAA Complaint to the 55th Medical Group. Their statements verified that the employee in question was witnessed being on Facetime while on calls with the public. The investigating Officer, Dr. Ochia, for the inhouse HIPAA Complaint wanted to know "which" patients were harmed. She thereafter ruled that there was no violation of HIPAA as it was "unsubstantiated". She "twice" asked me if others had witnessed the behavior? I twice told her she had those emails. However, court precedent states otherwise:

"Labor Law § 741, often referred to as the Health Care Employee Whistleblower Act, offers special protection to health care employees who `perform[] health care services.'

[i] *Minoque v. Good Samaritan Hosp.. 100 A.D.3d 64. 69 (2d Dept 2012)(citing Labor Law § 741(1)(a)). Specifically, Labor Law § 741(2) provides that "no employer shall take retaliatory action against any employee because the employee . . . discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care." "A cause of action alleging a*

*violation of Labor Law § 741(2) differs from a cause of action alleging a violation of Labor Law § 740(2) in that such a complaint is required to allege only a good faith, reasonable belief that there has been a violation of the applicable standards, rather than an actual violation."* Pioio v. Nassau County, 34 A.D.3d 664, 666 (2d Dept 2006). *"A complaint asserting a violation of Labor Law § 741(2)(a) must nonetheless allege conduct that `constitutes improper quality of patient care,' which is defined as `any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling adopted pursuant to law, where such violation relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific*

- **patient.'"** Minoque, 100 A.D.3d at 70 *(citing Labor Law § 741(1)(d)).*

So, in a sense there is a lower burden of proof for those working in a healthcare environment in reporting suspected compromise in order to protect the public. That was what this was and is all about, protecting the unsuspecting patients. *This employee did this for nearly two years! A conservative estimate is that she had over 20,000 encounters with patients in that time frame. The employee who informed me of her illegal habit also told me she herself had also brought up the matter to management the year before, but nothing had been done about it.

Highlighting the imperative that possible, suspected breaches be reported within those sacred 60 days is noted by healthcare attorney Corrine Smith interviewed on HealthITSecurity.com. The following she states is policy per HHS/OCR. https://healthitsecurity.com/news/hipaa-is-clear-breaches-must-be-reported-60-days-after-discovery

Under HIPAA, a breach is determined "discovered" by a covered entity on the first day a breach is known, or would have been known, by the covered entity by exercising "reasonable diligence," Smith explained.

"'Reasonable diligence' is defined in the HIPAA Enforcement Rule to mean the 'business care and prudence expected from a person to satisfy a legal requirement under similar circumstances,'" she said.

Further, the Office for Civil Rights will determine a covered entity had knowledge of the breach, if it's uncovered by a member of the workforce, other than the person who caused the breach, said Smith. And "it doesn't matter whether or not management has notice."

So once a breach is discovered, Smith stressed that notice to the impacted individual must be provided with 60 calendar days of the initial breach discovery. And if more than 500 patients are involved, OCR and media outlets must also be provided.

Even if an investigation is still ongoing, OCR will not make an exception to this rule. As Smith pointed out: "the only exception to the 60-day requirement is if it requested by law enforcement."

"Timing begins on when it is known, not when the investigation is complete — even if it is initially unclear whether the incident constitutes a breach as defined in the rule," said Smith. "The 60 days is an outer limit, and, in some cases, it may be an unreasonable delay to wait 60 days."

"It's not a good idea to wait until your forensics investigation is complete before thinking about providing notice," she continued. "It's best to run parallel tracks – one preparing to notify patients and the other running the investigation."

To help remain in compliance, health providers "must incentivize employees" to report discovered breaches "without penalty or fear of retaliation." Smith said that delayed investigations are often caused by failure to communicate security incidents to the right leaders.

"The lesson is that it is better to get notice out timely than to worry about having full knowledge and details of the breach," Smith said.

Recently, the Department of Health and Human Services updated its maximum civil penalties for HIPAA violations. HHS breaks penalties down into four tiers: no knowledge that HIPAA was being violated, reasonable cause, willful neglect – corrected, and willful neglect, not corrected in a timely fashion.

*Please keep in mind, the employee using Facetime while on calls with patients was also doing this for an additional year before I began employment there-an employee told me this. Colonel Ochia "swept the problem under the rug" by first not acknowledging my corroborating witness statements and then asking me for specific patient names. Of course, names would help but they are not imperative. However, please note the court rulings in the two pages prior to this sentence. Besides, a "suspected" breach abides by the same 60-day parameter as the outcome is inconclusive pending the result of the investigation. In a different sense, willful neglect in my opinion, can also possibly apply to an employer refusing to position an onsite supervisor at the operation for which they are responsible for.

7. *Since Laredo decided not to compensate someone to supervise the operation in real time and on-site the routine of the day was chaos. When confronted with the HIPAA violations I brought it up to Ms. Conaway who simply said, "Well, but does she put it on mute?". I was aghast, this was the wrong answer. This had to do with the Laredo employee "employing" Facetime while on calls with the public. Insanely, a medical administrator working for the USAF and beholden to protect patient privacy refused to act on the matter but protected her to the harm of the public. I likewise had no confidence with Mr. Taylor or Laredo extinguishing the matter and dealing with the aftermath of the illegal disclosures. Mr. Taylor "might" return a reply fairly promptly, it might take weeks, or it might never occur. Indeed, on my second recorded call he said he would call me back which he never predictably did. A former employee who tried to give a 2-week notice finally got ahold of Laredo after those weeks had expired in order to accept another job. We all had "challenges" when on occasion a medical appointment had to be made or such and Mr. Taylor at Laredo could be contacted for

permission to keep the appointment. Mr. Taylor, who traveled around the world was the only point of contact for the employees. Primarily, I did not trust Laredo to address the HIPAA violations in a timely manner, or, to deal with it rightfully, period-this was borne out later. I further did report it to the DoD Inspector General's Office as listed in the Laredo Company Handbook. After Mr. Taylor was apprised of it in print and repeatedly on the phone he finally said, "I will talk to her about it" (meaning the Facetimer). Well, it continued even after his encounter. Who was going to protect the public? Perhaps I myself had been compromised when I had called the Appointment Line; it is the main phone number for the facility. I therefore had no confidence in Laredo professionally addressing the problem. According to the Office for Civil Rights, when filing a HIPAA complaint nationally the following is noted. If one witnessed a HIPAA violation and willingly fails to report it within 60 days, then that party is also now likewise complicit and is liable both criminally and civilly when the violation is eventually reported. I saw no cooperation with the USAF and did not trust Laredo to deal with the matter effectively, or, in a timely manner. I was not about to jeopardize my own standing had the 60-day period lapsed while awaiting the USAF or Laredo to deal with the violations. One had to act with alacrity to bring attention to the (mal)practice so it would hopefully cease and to register the complaint as mandated per Federal law. **An example of the _chaos_ I suffered was the following. Of the five employees assigned to the Medical Appointment Center, three were sent home and removed from working temporarily. The other, the Facetimer in question, simply was "missing". She was sent home to work remotely in March but was unable to assist the public (?). So, on the 8th and 9th of July, I was left alone to service the patient population of over 27,000 patients! However, Captain Beasly who was in the facility, and who had taken calls before did not assist me. I had patients who had been on hold for nearly 2 hours and frankly told me they had hung up and called back in the hopes of not waiting as long. At the end of the day, not being paid for this, I visited the Clinic Commander, Colonel Ostrand who had an Open-Door Policy (would this upset Laredo too in the person of Mr. Taylor?). I pleaded with the Commander about needing help in the center to take phone calls. This was poor patient care and was not fair to the public. However, I simply mentioned the waiting time to her. I further mentioned that Captain Beasly had taken those calls in the past and could assist me. The following day, no help again, a repeat of the prior day (and Captain Beasly was in the facility). Laredo of course, was useless, they could have "encouraged" the Facetimer to actually take calls from home, or, to return to the clinic to work. I was advocating for the public as in submitting the HIPAA Complaint. Captain Beasly was also mentioned in the June 1st memo of mine for agreeing with cursing in the workplace, that it was accepted (she demonstrated it).

8. Believing of course that "something" needed to be done immediately to stop the HIPAA violations, possibly notify the public, and, to hopefully monitor the ongoing situation I brought up the matter first to Ms. Conaway. She, as the GPM, or General Practice Manager, whose responsibility it was to oversee the operation of the Appointment Scheduling Center. When she was not present USAF Captain Valyn Beasly functioned in that capacity as well. Conaway had already protected the Laredo employee and I was astounded at her reply and refusal to deal with the situation. Beasly, as well, was not reliable nor to be trusted either. I had once complained that patients could hear the same individual loudly, angrily cursing while I and others were on the phone with patients. That did no good as Beasly seconded her atrocious behavior and said, "I love to curse too!" in front of the staff (supporting documents shall show the proof of this). And, due to the dilatory and at times destitute non replies of Mr. Taylor with Laredo I submitted a handwritten memo on June 1st, 2020, in the hopes that "someone" would take notice of the HIPAA problem (aside items were mentioned to

characterize the environment). I handed it in to the Acting Clinic Commander, a Contracting Officer and to the office for Ms. Conaway. The HIPAA violations were the crux of the communication. The Acting Commander (his name is documented as well) asked me if I had submitted a formal HIPAA complaint yet? Several others also asked me if I had filed the complaint to initiate the investigation. I told them all no, I had not. If fact, I plainly wrote later in that HIPAA complaint that it was never my desire to submit the complaint, but that management would just terminate the practice and properly address it. The Contracting Office is the intermediary between the USAF GPMs and the Contractor, Laredo. I expected Contracting at the behest of the GPMs to inform Laredo of the situation (after all one of their employees is the perpetrator of the deeds). Twenty-seven days later out of courtesy I sent a now typed written copy of my June 1st memo along with the narrative I created for the inhouse HIPAA complaint via Mr. Frank Brown the 55th Medical Group HIPAA Officer to Mr. Taylor. The following day I spoke to Mr. Taylor, and asked him if he had gotten the transmissions? There was no direct response to what I sent to him. Several times I had to orally bring up her violating HIPAA protocols. He then began making excuses for her such as she must only be using Facetime while on breaks or at lunch (this despite three other witness statements submitted along with complaint). And, nonetheless, the offender continued coupling her Facetime calls while calls from the public came in. This, even after being supposedly spoken to. This call on June 29th, was not recorded, but I can furnish proof of the email sent with those attachments sent when this enters the discovery phase. However, I asked Mr. Taylor when the Facetimer would return to work, and he rudely told me that "That was none of my business". I told him that I understand HR regulations, I was simply asking as we desperately needed help in the workplace. He then followed up the reply and told me that "You make a good living" which I obviously took as a threat from him. I also asked him how _he_ would have addressed the HIPAA violations? He said he would  have told the Air Force (which I did). I also asked him how would he report something he did not witness but only knew of secondhand? He did not reply to this. The HIPAA Office has an Open-Door policy for a good reason, to encourage reporting. Actually, according to Federal law on day one I could have just walked into Mr. Brown's office and filed the complaint without initially notifying the facility or the contractor for "permission", but I did not. In fact, in the Laredo Technical Services Inc., Employee Handbook the following is published on page 15:

**2-13, Whistleblower Protection Act-DoD Hotline**

Laredo Technical Services holds a high standard when it comes to protecting, identifying and controlling the government information that our companies come in contact with. The Company supports the employees coming forward and reporting any and all potential "red flag" issues and suspicious activity, whether it is classified or unclassified.

If you feel as though you are witnessing fraud, waste or abuse of any type, or feel you have experienced retaliation from reporting such actions, you can contact your Laredo Facility Security Officer (FSO) at 210-519-7021 or by calling the DoD IG Office, toll free, at 1-800-424-9098.

The following is a link to the DoD Office of Inspector General web page and provides hotline resources for you to use to report those actions:  http://www.dodig.mil/Components/Administrative-Investigations/DoD-Hotline/.

In  reading their own policy, one can easily see the hypocrisy as Laredo retaliated against me for using due diligence in enforcing the policy they propound. As is shown, I was given a _choice_ of notifying

*either* the Laredo Security Officer (Ms. Heim), *or,* initiating a DoD IG Complaint (which I did do). And, besides, seventeen days before I filed the IG complaint Mr. Taylor was informed in print and voice by myself. He himself also could have formally initiated an investigation by contacting Ms. Heim who logically would have contacted me, the witness (that was not forthcoming, not surprising). He falsely accused me on a recording of "going over their heads, including the Captain's (Beasly,). His statement is a falsehood. Had he had a local Laredo supervisor he would have known the truth (but I tried several times to tell him so). The Air Force, in the persons of their "Practice" managers were informed onsite to no avail. This quandary with Mr. Taylor was all due to Laredo's choice not to place "boots on the ground" to directly manage their operation. It probably would have accomplished the necessary measures of ceasing the illegal practice of being on Facetime while on calls with public and the person would have been administratively warned on paper with witnesses. But that in of itself would not have precluded a formal HIPAA violation filing needing to be done per the Federal statute. I did not get paid to manage Laredo's operation. Mr. Taylor wanted it both ways, no problems, but also no tools in place to effect that. I really should have been commended, not punished for speaking up for the public. In healthcare, as in all professional vocations there are norms to abide by and to be obeyed. In the healthcare arena is the term "Community Standard", simply what is commonly, professionally agreed upon expected behavior amongst healthcare providers in the community. I anonymously called the head of HIPAA enforcement for Nebraska Medicine and her opposite number at CHI Health in Omaha, Nebraska. I did not divulge who I was, nor, where I worked. I did not do so to protect the facility and the patient population. I just presented a hypothetical situation-that of using Facetime while on calls with the public. Would that use be "permitted"? Both were stunned and bluntly said in no way! Of course, it was mentioned it would result in dismissal of the employee but also concomitant ramifications possibly both criminally and civilly for the facility; nothing to tolerate. This can be proven even today with ordinary phone calls again to those offices. I "happened" to run into Mr. Frank Brown, the facility HIPAA Officer and told him what was transpiring, he was totally shocked. He of course to remain a neutral party could not tell me what to do but his reaction was evident. And, of course, all healthcare organizations conduct mandatory onboarding orientation with relevant departments to instruct new employees of policies etc. HIPAA of course is required (*especially* a Federal facility) and ought to be the simplest to apprehend and abide by. After deliberately flouting the HIPAA policy, which she would have had to sign off on as acknowledging, I believe she would have been walked out the door post-haste working at those civilian hospitals. Her signature can be obtained via the 55th Medical Group per accreditation standards. As it was, she was eventually supposedly fired by Laredo a mere 4 hours after me on the same day. This, after nearly two years for other matters, besides HIPAA. This was done I believe to legally insulate Laredo against a lawsuit being brought by me against them for her violating HIPAA and my reporting of it. Again, had Laredo placed someone physically in charge instead of management in absentia other things would not probably had taken place. Or, at the very least, curtailed and addressed justly.

9. Sequence of reporting. On June 1st, 2020, I submitted a handwritten complaint to leadership in the 55th Medical Group about the ongoing and past HIPAA violations *after* the GPMs, Conaway and Beasly enabled the HIPAA violations to continue and allowed her other practices to continue too. So, *I did* consult them prior to the inhouse informal complaint on my part. *Therefore, there was no breaking of the Laredo so-called HIPAA Chain of Command or with the USAF. On June 26th, 2020, I filed a formal HIPAA Complaint with the 55th Medical Group. Despite three witness statements besides my own it was adjudged "unsubstantiated" by the investigating Officer, Dr. Ochia. At the meeting she *firstly*

assured me that the person in question would not get paid if she did not work (what had this to do with a HIPAA Complaint?). *This was afterwards found not to be true. However, the intent of the meeting had only to do with HIPAA, not any other matter. It was further evidence of the USAF and Laredo unfairly advocating on her behalf against myself and HIPAA compromised public. I could not believe a provider; a physician would take this stance. Twice I was asked for corroborating witness statements, twice I said you have those. Dr. Ochia then dumbfoundedly asked me if a knew the names of any patient's HIPAA privacy rights she had compromised? I said I do not recall specifically (but it was loud and continual). I had no right myself to inspect another's call with a patient, note names etc. (unless monitoring via management). Was this a clumsy attempt on her part to see if I cross contaminated HIPAA Privacy rules myself? The HIPAA Privacy Officer Mr. Frank Brown assured me he had included those. The matter was then referred to the Defense Health Agency for further review.

On June 28th, 2020, I emailed Mr. Leonard Taylor a now typed written version of my June 1st submission along with the narrative I created for the 55th Medical Group HIPAA Complaint. I called him the following evening and he assured me he received those. He did though all he could do to excuse her use of Facetime while on calls. He finally told me after several urgings that he would talk to her about it. But her practice of using Facetime while on calls with the public continued, nonetheless.

On July 6th, 2020, I then filed a HIPAA Complaint with the Office of Civil Rights. They decided to assist the DHA (Defense Health Agency) in resolving the complaint on July 10th, 2020. That complaint number is CU-20-387065. *However, on June 14, 2021, I sent an email to reopen the investigation since Laredo reprised against me by discharging me on August 13th, 2020. I am awaiting a reply regarding that new complaint.

On July 15th, 2020, I filed a complaint as per the Laredo Company Handbook with the DoD Inspector General's Office. That case number, 20200714-0658846 was closed without comment on July 25th, 2020. *However, now per the same stipulation in the Laredo Handbook, I today phoned in another follow-up complaint concerning the original complaint. This is due to reprisal on their part, firing me for supposedly violating their "HIPAA Chain of Command" on August 13th, 2020. The website is down for maintenance until July 19th, 2021. Today, July 7th, 2021, I spoke with an individual at length about reopening my original complaint with the IG Office. She agreed with my doing so and she has forwarded it now formally to an individual who handles Whistleblower Reprisals who shall shortly be in touch with me.

On September 5th, 2020, I submitted a complaint to the JCAHO (Joint Commission on Accreditation of Healthcare Organizations). That complaint, case number 63540SXM-93664AHZ was acknowledged by them on September 8th, 2020. That case was closed via an email I received on December 1st, 2020.

10. I have never worked for an employer where management is not available in regards of proximity and/or immediacy. Even a McDonald's has "A" seventeen-year-old in charge with the necessary authority. Laredo was derelict regarding management. They abdicated their responsibility in order to expend less money for salaries out of the awarded contract. Their responsibility without saying was to professionally manage that contract and their employees. By their absence they were complicit in what took place as their function was also to be an active middleman between the Laredo employee and the hosting facility as well. It was not possible many times to get ahold of the singular person representing Laredo in the person of Mr. Taylor. He might be halfway around the world, or simply would not return the call or email. The Air Force many times would tell us we would have to contact

Laredo which it was impossible to do. If one got ahold of Ms. Heim, she immediately fairly yelled at us that "You don't work for me, you work for Mr. Taylor!". No, I work for Laredo, and I am doing everything I can to contact *someone* at Laredo. When I submitted my memo on June 1st it was primarily to persuade "Anyone" to address the HIPAA violations that day, that week, to put a stop to it. I included several aside incidents to display the environment which allowed an employee to commit the HIPAA infractions and the refusal on onsite management to address the matter. I did so also in print to prevent further retaliation by the Laredo employee. A few vignettes which typified experiences Laredo was willingly ignorant of lacking local representation. One day, I tried to gently dissuade the same individual from loudly cursing, while I and others were on the phone with the public. However, later, Captain Beasly topped her and said she absolutely loved to curse as well! She stated this in front of the staff and supported it by regaling us with an exchange she had had with a student of hers at the community college. Beasly then interrogated me with the Contracting Officer in tow while I was taking calls with the public (a Facetime flashback). She also pulled me up to her office (I was later told in violation of the contract) to further examine me. It seemed no matter what this employee did both the Air Force and Laredo covered for her despite the HIPAA violations etc. Dr. Ochia immediately made an excuse for her not working. One day Conaway walked in and said she had only worked a couple of days in two weeks. She further added that she didn't work for an entire week and did not give notice to Laredo or the Air Force with no recriminations at the time (to us anyway as it continued unabated). Laredo perfunctorily discharged her amazingly only hours after me to protect themselves. *If she were rehired by Laredo, I would not be shocked. She was well-late almost each and every day. I, and others had to self-manage ourselves, beg for staffing with no cooperation or oversight by Laredo. One day the same employee furiously threw some candy back at me I had given to the staff and herself. Another day she heard me say to the patient, "So, you're one of us". She went ballistic and it was all I could do to quickly terminate the conversation kindly but professionally with the patient, so he didn't hear her violent and vulgar tirade. Then I again softly explained to her that I used that phrase since he was also an employee of the Medical Group. That didn't satisfy her as she again volcanically got on the phone attacking me with one of her friends or family members and repeating the phrase I had so used. This was the temperament of this person I and others had to tolerate. So, with Laredo deciding to save minimal dollars by not compensating someone to be in authority on site the only thing left to do would be to call Laredo on the matter. But how can one report on an equal without further inflaming an already incendiary situation? Mr. Taylor's refusal to address the situation which impacted me, and all of us, including the public, was due to non-management. This strategy to save money but failing to supervise the operation was deliberate by Mr. Lukowski. As Mr. Eastwood would say, For a Few More Dollars. This was abuse allowed by management on a proficient scale. The lady in question would routinely stroll into work, 20, 30 minutes late and yell at the top of her lungs "Who is not on the phone!". Any of this nonsense would have been escorted out the door in any other healthcare facility which I tried to convince Captain Beasly of. Ironies, of ironies, before working in the Medical Appointment Center, this employee told me she had worked in the department which housed the facility HIPAA Privacy Office. After appealing to the owner of Laredo I was told to submit another application in January of 2021, which I did (the opening is still not filled).He said he would consider the first two applicants. Had Laredo made the wise and equitable business decision, and professionally abided by the stipulated contract terms to suitably manage the operation, it would have avoided many issues. An onsite manager could have resolved all matters, negligence did not do so. Employee conflicts would have been dealt with and

HIPAA violations would have ceased. The "Facetimer" is identified in the supporting documents. She asked others to address her by a first name which begins with "K" but her given name begins with an "E".

11. *Violation of Nebraska Public Policy regarding protection against Identity Theft. *Nebraska Revised Statute, 28-636; 2009 LB155, § 8; 2015 LB348, § 3. Oftentimes we appointment schedulers would have to repeat a person's name, date of birth, or verify the social security number besides other demographic data. Pieces create puzzles. The following experience transpired. A local gang member made the news. The Facetimer mentioned that she knew him, "he's a nice person", and that she knew other "gang members". We four heard this and one lady laughed when she said he was a nice individual. Now, I am not saying she deliberately passed on social security numbers to "her friends". But what I am saying is she also had improper judgement of others and who knows who might've gotten ahold of this vital information while she was on Facetime? Identities are highly profitable commodities with criminals. I myself have been a victim of identity theft and it is not pleasant, especially with people now being able to create false property titles to evict owners etc. Many retired military patients and their dependents are Nebraska residents, to say nothing of those who live in Iowa and cross the river for care. And, what about the active-duty patients and families who are domiciled in the other 48 states and territories? All of these patients potentially have been at risk for having had their identities stolen. Certainly, the HIPAA privacy violations expose this and has placed the Nebraska public at risk. What better conduit of identity theft than through a Federal installation? Intentional neglect to position one with supervisory authority on scene could have guarded against unwarranted disclosure of identity data of Nebraskans and others to criminal elements. The refusal of Laredo to professionally manage their awarded contract and their associated employee is responsible for the cavalier and demonstrable compromise they have subjected the public to in both medical and financial terms. I frankly could not believe that both the USAF *and* Laredo were so casual in their respective responses. Over 4.9 million military healthcare members had their identities stolen in 2011 via Tricare. As I said, I was one of those victims and was only trying to advocate for the public while following Federal law. But Laredo is truly the entity directly at fault. Captain Beasly and the kind Airmen who assisted on the phones during drastic manning shortages "managed" to observe basic HIPAA privacy, why not Laredo? Cell phones are also prohibited in call centers to prevent people from taking pictures of identity markers. The Nebraska legislature is duty bound to protect Nebraska citizens, thus, the violation of public policy.

SUMMARY

*At the outset, let me first state that in addition to this complaint, I may use this complaint to support another one. As a patient myself, I have also called the Medical Appointment Line at the 55th Medical Group and consider my conversations, my HIPAA rights and demographic data compromised as well. So, I may also file a second lawsuit against Laredo Technical Services in the capacity as an injured patient (not as a discharged employee in this complaint). In September 2011 I walked into my home and on NBC the Tricare data breach which affected 4.9 million patients was announced. I do not wish to reexperience this very unpleasant trial.

*Frankly, I am angry and disgusted. I cannot believe the unmitigated gall of Laredo to unlawfully fire me for carrying out Federal law designed to protect the public. They fired me not for ignoring the law, but for fulfilling it. Never once did Mr. Taylor commend me or thank me for doing the right thing. No,

he along with the owner decided to punish me for it. For the Facetimer, was committing HIPAA violations listed as a reason for firing her? To even the scales they decided to assail me for reporting the matter to ease their conscience in being forced to fire her. This was also done to protect themselves legally. I was harmed in carrying out responsibilities that they themselves were accountable for. They damaged me and those of the sovereign public to protect an undeserving employee. They promoted and defended their desires above that of the Federal Government and the State of Nebraska's Laws. They were also corporately embarrassed and did not know how to explain this dilemma.

*One cannot break an imaginary "HIPAA Chain of Command" where none exists, statutorily.

*In no way can anyone "prove" that I broke any HIPAA chain of command, period.

*I indeed reported HIPAA violations in line with mandated Federal Law per HHS/OCR (and had to within those 60 days).

*I also obeyed the Laredo Company Handbook and reported the matter to the DoD Inspector General's Office.

*Mr. Leon was informed of the HIPAA violations both via voice and print.

*Reinvestigations have been reopened with both the Office of Civil Rights and the DoD Inspector General's Office since Laredo reprised against me by discharging me in essence for reporting the HIPAA violations with both agencies.  *This of course violates the Federal Whistleblower's Act of 1989, (WPA), Executive Order 12731, and the Whistleblower Protection Enhancement Act (WPEA) of 2012.

*I made known the HIPAA violations to the onsite government officials, the General Practice Managers, GPMs, Conaway and Beasly at the very outset at the 55th Medical Group. I therefore did not break "anyone's" invented "HIPAA Chain of Command". They just approved of the ongoing practice and refused to act against it. Additionally, interchangeably, Conaway and Beasly as GPMs were reciprocal. That is, each oversaw the Medical Appointment Center for the USAF and covered for one another. One might be gone part of the day, the week or so forth. What one was made aware of necessitated communicating with the other, like a pilot and copilot, comparing notes as in shift change. Often times each would walk in and parrot what the other one had said earlier that day. The Air Force was duly informed of the HIPAA violations that day while I was on the phone with Ms. Dana Conaway. Whether Captain Beasly was even there that day I have no way of knowing. She had also been "away" on official leave as we the staff were all told. Ms. Conaway can be considered the "senior" GPM as she has worked there for 17 years. I tirelessly told Mr. Taylor that I surely had informed the Air Force assigned, relevant party about the matter which still has not satisfied him to this day. Certainly, had I just made a visit to the HIPAA Privacy Officer all the preceding would have been meaningless. Or, better yet, had Laredo in place a physical manager I would more than gladly had deferred the matter. Another instance of Mr. Taylor placing the onus on me and directing that I manage his mission for him.

*I could have initially reported the matter to the 55th Medical Group HIPAA Privacy Officer, Mr. Frank Brown without securing "permission" from anyone. The Open-Door policy is encouraged and explicitly

protected against retaliation. I also probably could have made it anonymously (which would not have really solved the issue).

*Per the contract, the Air Force, in the persons of the GPMs, Ms. Conaway and Captain Beasly (and others) also had the right, indeed, the obligation, to observe physically the operation of the Medical Appointment Center. I witnessed them doing this at times myself. Why then, did they not report the Laredo employee on Facetime while on calls with the public, cursing etc. _before_ I and others spoke up? They are without excuse.

*Laredo decided against appropriately managing their awarded contract operation and left myself and other employees without oversight and involvement on their part.

*Repeatedly informing me by two Laredo company officers that I had violated their HIPAA Chain of Command has greatly harmed me. They are not trustworthy as they deliberately and deceitfully did not list this on my termination letter. However, without pause they reminded me of their fireable offense I had committed. Besides this, having glibly told me, they would unhesitatingly and probably have already released this to other prospective employers. Since Laredo uses invented industry jargon not understood by myself, nor the world, an employer might understandably believe I was the HIPAA violator, not the reporter. And, who wants to hire an employee fired for such an issue? Who is to be believed, and, what about litigation (as in this communication)? I not only have a long background in clinical healthcare but worked hard to get my Bachelor's Degree in Healthcare Science and an Associate's Degree in Allied Health (while working full-time), much time, expense, and effort on my part. And I can renew my Nationally Registered EMT license. This has caused me much stress in finding work, and, even getting replies back from employers. In December 2020, in order to get any work, I labored intensely in an Omaha Steaks Warehouse loading dry ice packets up to 20 lbs. each non-stop into coolers for shipment. I did this for 11 days straight, for 11 hours, then, with a day off resumed it for two additional weeks. The effect of their harming my reputation shall go forward and not cease regardless.

*Laredo was of course also managerially negligent in dealing with the Facetimer herself, yes, that's right. Concerning the HIPAA violations and other issues she "deserved" administrative actions in person such as counselings, warnings and other tools so she would cease and amend her behavior and _Not_ lose her job. These remedial procedures also needed to be monitored in person. Noncorrected habits of hers she probably brought to another position elsewhere. They did her no favors as well. It goes back to not having one of authority on the grounds. Equals lording over others only engenders strife and worsens an already severe situation.

*Having said that, regardless of what one may think this was not a personal vendetta on my part towards the other employee. It was about obeying publicly posted policy and protecting all the public; I would have done the same to protect her if she were a patient in the system. For the record, I attend an almost entirely African American church and was married to a black woman for eight years.

*The public, the individual is the victim as well of course. Unknowingly, something possibly is "out there" in the ether which has already been used or shall be used against them. Not only violating private, personal medical information but also possible identity theft.

*Of foremost importance of course to Laredo is that of deniability. Ignorance is not a defense. The owner, Mr. Lukowski well *knew* the financial savings realized by not choosing to pay someone a higher wage to supervise their operation in Nebraska. Proper, in place management was not a consideration, it wasn't financially advantageous.

*My education cost in excess of $27,000 to say nothing of the years of labor and learning I acquired in doing clinical care. The damage done to the coupling of healthcare degrees along with my experience has been great. Most critically, the mentioning of "HIPAA" along with my discharge has already harmed me and shall continue to do so in the future. I need to be compensated for the anxiety and stress this has caused me. I have been unsuccessful in securing employment earning anywhere near what I was compensated for while working at Laredo. I, of course, cannot trust Laredo as a reference, despite Mr. Taylor's false assurances. So, asking employers *not* to contact them immediately paints me as the one being disingenuous and has injured my prospects.

## CONCLUSION

I was earning a wage of $17.81 per hour while employed for Laredo Technical Services Inc. (I declined the healthcare coverage). Per annum that is $37,044.80. *Partially*, I am requesting one year's back pay as I have been sporadically employed and underpaid since August 13th, 2020. Besides that, year of salary, I am also asking for an additional full year's pay due to stress and for damaging employment possibilities in the future. This other annum of $37,044.80 adds up to a total judgement request of: $75,000.00 This is the norm per the False Claims Act (2 years of salary plus interest, miscellaneous charges etc). And reinstatement of one's job *if one so chose.*

## FUTURE LEGAL POSSIBILITIES

*However, with two renewed and pending investigations ongoing with the Office of Civil Rights and the DoD Inspector General's Office, should it be determined that Laredo Technical Services Inc. is found culpable of violating the HIPAA Act (involving both criminal and civil penalties), I herewith also claim up to the legislated 30 % of damages assessed against Laredo Technical Services Inc. I ask therefore for the right to pursue those monies in the future regardless of the Sarpy County District's Court determination after this trial (unless outcomes materialize before the trial date and can be included).This same request applies to a second lawsuit I may bring as regarding harm done to me, the patient.

Daniel Holloran

12730 S. 28th Ct.,

Bellevue, Nebraska 68123

402-320-6051

daniel_holloran@yahoo.com

July 9th 2021

| Nebraska State Court Form | **PRAECIPE FOR SUMMONS/ PERSONAL SERVICE** | FILED SARPY COUNTY DISTRICT COURT |
|---|---|---|
| DC 6:4.4   Rev. 06/19 Neb. Rev. Stat. § 25-502.01 | | 2021 JUL 14  PM 3: 55 |

IN THE DISTRICT COURT OF SARPY_____ COUNTY, NEBRASKA
(county where Complaint filed)

*Ju Heath*
CLERK DISTRICT COURT

DANIEL JAMES HOLLORAN____,
Plaintiff,

Case No. CI 21 1666_____

VS.

JOSEPH G. LUKOWSKI_____,
Defendant.

# PRAECIPE FOR SUMMONS/PERSONAL SERVICE

## TO THE CLERK OF SAID COURT:

Please issue summons, to be served by the Sheriff of BEXAR_____County,
(County where other party is to be served)

TEXAS_____, along with a copy of the Complaint to:
(State where other party is to be served)

#221438

JOSEPH G. LUKOWSKI_____
(name of party to be served)
22011 ROAN BLUFF_____
(street address where party is to be served)
SAN ANTONIO, TEXAS 78259_____
(city and state where party is to be served)

Signature
DANIEL JAMES HOLLORAN
Your Full Name

402-320-6051
Phone

Date 7/14/2021_____
12730 S. 28th CT,_____
Your Full Street Address/P.O. Box
Bellevue, Nebraska 68123_____
City/State/ZIP Code
daniel_holloran@yahoo.com_____
Email Address

☐ IFP Order on file

Page 1 of 1
Praecipe for Summons/Personal Service
DC 6:4.4 Rev. 06/19

000727164D59

| Image ID:<br>D00221438D59 | **SUMMONS** | Doc. No.   221438 |

IN THE DISTRICT COURT OF Sarpy COUNTY, NEBRASKA
Sarpy County Courthouse
1210 Golden Gate Dr, Ste 3141
Papillion           NE 68046 3087

Daniel J Holloran v. Joseph G Lukowski

Case ID: CI 21     1666

TO:   Joseph G Lukowski

**FILED BY**

Clerk of the Sarpy District Court
07/14/2021

You have been sued by the following plaintiff(s):

    Daniel J Holloran

| Plaintiff: | Daniel J Holloran |
| Address: | 12730 S 28th Ct |
| | Bellevue, NE 68123 |

| Telephone: | (000) 000-0000 |

A copy of the complaint/petition is attached. To defend this lawsuit, an appropriate response must be served on the parties and filed with the office of the clerk of the court within 30 days of service of the complaint/petition. If you fail to respond, the court may enter judgment for the relief demanded in the complaint/petition.

Date:   JULY 14, 2021        BY THE COURT:

Clerk



PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE COMPLAINT/PETITION ON:

        Joseph G Lukowski
        22011 Roan Bluff
        San Antonio, TX 78259

BY:  Foreign Officer
Method of service:  Personal Service

You are directed to make such service within twenty days after date of issue, and show proof of service as provided by law.

| | SERVICE RETURN | Doc. No.    221438 |
| --- | --- | --- |

SARPY COUNTY DISTRICT COURT
Sarpy County Courthouse
1210 Golden Gate Dr, Ste 3141
Papillion          NE 68046 3087

To: Foreign Officer
Case ID: CI 21    1666 Daniel J Holloran v. Joseph G Lukowski

Received this Summons on _____,_____.  I hereby certify that on

_____, _____ at _____ o'clock __M. I served copies of the Summons
upon the party:
_____

by _____

_____

_____

as required by Nebraska state law.

Service and return        $ _____

Copy                          _____

Mileage ____miles          _____

    TOTAL            $ _____

Date: _____    BY: _____
                                         (Sheriff or authorized person)

## CERTIFIED MAIL
## PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

_____

Postage $ _____    Attorney for: _____

The return receipt for mailing to the party was signed on _____, _____.

To: Joseph G Lukowski
    22011 Roan Bluff

San Antonio, TX 78259

From: Daniel J Holloran
      12730 S 28th Ct
      Bellevue, NE 68123

## ATTACH RETURN RECEIPT & RETURN TO COURT

*came to hand* ~~JUL 2 0 2021~~ *at 11:37 AM*

**SERVICE RETURN**

Doc. No.    221438

SARPY COUNTY DISTRICT COURT
Sarpy County Courthouse
1210 Golden Gate Dr, Ste 3141
Papillion                    NE 68046 3087

To: Foreign Officer
Case ID: CI 21    1666 Daniel J Holloran v. Joseph G Lukowski

Received this Summons on _____,_____. I hereby certify that on ___

__8/6/2021__, _____ at __1152__ o'clock ☒M. I served copies of the Summons upon the party: __Joseph G Lukowski__

by __IN Person at 22011 Roan Bluff SA, TX 78259__

_____

_____

as required by Nebraska state law.

Service and return        $ _____

Copy                         _____

Mileage _____miles           _____

   TOTAL            $ _____

**JAVIER SALAZAR, SHERIFF**
**BEXAR COUNTY, TEXAS**

Date: ___8/6/2021___    BY: __P. CORDOVA # 1056__
                              (Sheriff or authorized person)

FILED SARPY COUNTY DISTRICT COURT
2021 AUG 13 PM 2:26
CLERK DISTRICT COURT

## CERTIFIED MAIL
## PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

000735815D59

_____

on the _____ day of _____ _____, as required by Nebraska state law.

_____

Postage $ _____    Attorney for: _____

The return receipt for mailing to the party was signed on _____,_____.

To: Joseph G Lukowski
    22011 Roan Bluff

San Antonio, TX 78259

From:  Daniel J Holloran
       12730 S 28th Ct
       Bellevue, NE 68123

# ATTACH RETURN RECEIPT & RETURN TO COURT

Image ID:
D00221438D59

**SUMMONS**

Doc. No.    221438

IN THE DISTRICT COURT OF Sarpy COUNTY, NEBRASKA
Sarpy County Courthouse
1210 Golden Gate Dr, Ste 3141
Papillion            NE 68046 3087

Daniel J Holloran v. Joseph G Lukowski

Case ID: CI 21    1666

TO:  Joseph G Lukowski

You have been sued by the following plaintiff(s):

Daniel J Holloran

Plaintiff:          Daniel J Holloran
Address:            12730 S 28th Ct
                    Bellevue, NE 68123

Telephone:          (000) 000-0000

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Date:  JULY 14, 2021        BY THE COURT:    *signature*
                                              Clerk



PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        Joseph G Lukowski
        22011 Roan Bluff
        San Antonio, TX 78259

BY:  Foreign Officer
Method of service:  Personal Service

You are directed to make such service within twenty days after date of issue,
and show proof of service as provided by law.

# Bexar County Sheriff's Office
## 200 N Comal St.
## San Antonio, TX 78207



---

## Payment Receipt

---

**Payment made by:** DANIEL J HOLLORAN
12730 SOUTH 28TH CT
BELLEVUE NE 68123

| | |
|---|---|
| **Payment Date:** | 7/20/2021 |
| **Payment Type:** | Money Order |
| **Check Number:** | 52437 |
| **Receipt Number:** | 357 |
| **Payment Amount:** | 85.00 |

| Civil # | Docket # | Title | Amount |
|---|---|---|---|
| 21006200 | CI211666 | DANIEL J HOLLORAN<br>vs.<br>JOSEPH G LUKOWSKI | 85.00 |

Received by:    dorothy.gonzales                           Receipt #357                    Page 1 of 1



# INCIDENT DETAIL REPORT

# BCSO - _____

BEXAR COUNTY SHERIFF'S
DEPT.
ATTEMPTED SERVICE

| DATE | TIME | REMARKS |
|---|---|---|
| 1/29 | 2:00PM | |
| | NEG CONTACT. LEFT CARD ON DOOR - P CLOSE | |
| | | |
| | | |
| | | |
| | | |

RETURNED CALL.
STATED CALL BACK FOR SET UP
(2)710529 04

8:21-cv-00347-JMG-MDN    Doc # 1    Filed: 09/07/21    Page 24 of 24 - Page ID # 24